**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LAURA KAUFMAN<br>Plaintiffs<br><br>-against-<br><br>MELLISSA GLIATTA<br>THOR EQUITIES LLC, and<br>JOSEPH J. SITT<br><br>Defendants. | Civil Action No.: |

**COMPLAINT with JURY DEMAND AS TO SPECIFIED COUNTS**

This is a Complaint for fraudulent inducement, breach of contract, bad faith termination, promissory estoppel, breach of the implied covenant of good faith and fair dealing, fraud, breach of fiduciary duty and for a declaratory judgment. It arises from the bad faith attempt by the defendants to induce the plaintiff into employment based on a guaranteed bonus which they refused to pay.

**Jurisdiction**

This court has subject matter jurisdiction under 28 U.S.C. §1332 because the plaintiff and the defendants are domiciled in different states and the amount in controversy exceeds $75,000.

**Parties**

1) Plaintiff Laura Kaufman ("Kaufman") is a Connecticut domicile who resides in Darien, Connecticut. Kaufman is an experienced real estate executive with extensive experience developing and managing real estate for the life sciences industry.

2) Defendant Melissa Gliatta is the Chief Operating Officer of defendant Thor Equities LLC (“Thor”). Gliatta is a New York resident and domicile.

3) Defendant Thor is a Delaware Limited Liability Company based on New York with its principal offices located at 25 West 39th Street, New York, New York.

4) Defendant Joseph J. Sitt (“Joe Sitt”) is the chairman of Thor.

**Background**

5) On or about June 11, 2021 Thor engaged Kaufman as Executive Vice President of Thor Sciences, a division of Thor established to enable Thor to enter into the business of life sciences real estate.

6) Until Kaufman was hired, Thor had little experience in the field. It had made a small number of acquisitions that were poorly underwritten. William Hunter, who had briefly headed Thor Sciences as a consultant, left the company but recommended Kaufman to Thor. Kaufman was previously Vice President of Biomed Realty, a real estate investment trust acquired in 2015 by Blackstone.

7) Biomed was and continues to be a global leader in life sciences real estate. As Vice President of Biomed, Kaufman managed over $1 billion in life sciences real estate for Biomed. Prior to that position, Kaufman had been with Lyme Properties, a company that was a founding leader in the life sciences real estate industry.

**The Agreement**

8) Prior to joining Thor, Kaufman engaged in extensive discussions with Gliatta about potentially joining the company.

9) During those hours of discussions, Gliatta represented to Kaufman that Thor had a $500,000,000 commitment from a Danish Pension Fund, PFA, for investment in life sciences.

10) Kaufman questioned Gliatta extensively about that commitment as she was aware of the risks of joining a company that lacked equity and was not willing to join a company that lacked assured equity.

11) On numerous occasions, Gliatta assured Kaufman that they not only had the Danish commitment, but also had extensive, long term relationships with major investors so that even if more equity was needed for projects, it was readily available.

12) The latter relationships were based on Thor's work in office retail, residential and other real estate fields, though Thor had little experiences with life sciences tenants.

13) Further, and unknown to Kaufman (and not disclosed by anyone at Thor), Thor's relationships in the investor community were tenuous due to multiple foreclosures on Thor properties.

14) After reaching an agreement in principle, Kaufman and Gliatta entered into negotiations for the Executive Vice President position.

15) Because the offered $400,000 base salary and $400,000 bonus were below market rates, major negotiating issue was  Kaufman's insistence that her bonus for the first year be guaranteed, with no contingencies.

16) Gliatta agreed to the guaranteed bonus ("Bonus"), which was incorporated into ¶4(b) of the Agreement. Exhibit A.

17) The Agreement was drafted by Thor in New York and signed by Kaufman in Connecticut.

18) Further negotiations ensued during which Kaufman insisted that the Bonus be paid even in the event of termination, so long as the termination was not for cause. That assurance was embedded into the Agreement as ¶6(b), which assured its payment.

19) The Agreement was executed on June 11, 2021.

**Kaufman Identifies over $2 Billion in Lucrative Investments**

20) Kaufman began work and, based on her extensive experience and contacts in the field of life sciences, she was able to identify a broad array projects. The underwriting for each project was highly favorable based on the rates of return sought by Thor.

21) Within the first year, Kaufman identified projects with a value of over $2,000,000,000.

22) Shortly after arriving at Thor, Gliatta disclosed that the agreement with PFA was not yet completed but would be finalized shortly. As it turned out, PFA never finalized its commitment for the $500,000,000 investment, so Thor needed to find individual entities to invest in the projects produced by Kaufman.

23) Thor advised Kaufman that if individual investors could not be found that it had over $1 billion on its balance sheet that could be made available, so Kaufman continued to look for attractive projects.

24) Thor's lack of available equity, and Sitt's refusal to use it alleged $1 billion in equity, proved to be highly problematic.

25) Numerous attractive investments could not be finalized and Thor's inability to provide proof of equity became a serious barrier.

26) A particularly embarrassing incident erose when Kaufman learned that Biomed, her previous employer with which she had excellent continuing relations, was looking to sell some attractive assets in the San Diego market.

27) Thor put in a bid and Kaufman arranged a conference call, which took place during her vacation, with Biomed.

28) The call was an embarrassment for Kaufman, given her long term relationship with Biomed. During the call, Sitt was unprepared and unfocused, spoke in generalities about how he liked to "do deals" without specifics about how he could finance Thor's bid, and failed to respond to specific questions posed by Biomed.

29) Despite Kaufman's underwriting that showed that the acquisition would be profitable at a higher price, Thor put in a lower offer and narrowly lost the property as a result. Under Kaufman's underwriting and recommended bid amount, Thor would have been selected as the buyer.

30) Thor lost the project when a slightly higher bid was accepted.

31) Problems with the other identified projects persisted when Thor's relationships with investors, previously claimed by Gliatta to be strong, failed.

32) All of those projects were, as Kaufman's underwriting had shown, attractive, evidence of which was that every single one of them found a buyer.

33) When Kaufman spoke with a long time contact with a major potential investor in Thor deals, he said his company would not work with Thor because of Sitt's reputation for retrading (a term for going back on agreements to renegotiate them).

**The Wrongful Termination Ruse to Avoid the Guaranteed Bonus**

34) On or about June 10, 2022, Gliatta spoke with Kaufman and said Thor wanted to get out of its agreement. She did so on less than 30 days' notice, as required in ¶6(a) of the Agreement.

35) After amendments to the Agreement imposed by Thor as a condition to Kaufman's continued employment, the first of which was in June, 2022, Gliatta informed Kaufman on December 5, 2022 that her employment was terminated (without cause) and that in

order to receive the base compensation under Agreement ¶4(a) she would have to sign a Separation Agreement and Release ("Separation"), Exhibit B.

36) Under the Agreement, Kaufman would have a right to her guaranteed bonus of $400,000, but Thor's termination gave less than 30 days notice as required under the Agreement it drafted. As a result, the $400,000 had to be paid because the notice of termination was given less than 30 days of when the bonus weas due and when the amendment then in force terminated.

37) Even under ¶5 of the Separation drafted by Thor, however, Thor was obligated to pay the guaranteed bonus because it was due "at a later date."

38) Further, ¶11 of the Separation provided that all covenants in the Agreement designated to survive termination under the latter Agreement, would continue in effect under the Separation.

39) The Agreement's covenant that the guaranteed bonus under its ¶6(b) would survive termination therefore remained in full force and effect.

40) Thor has never paid the guaranteed bonus.

**COUNT I: Fraudulent Inducement (Jury Trial Demanded)**

41) The allegations in ¶¶1-40 are repeated and realleged.

42) Gliatta induced Kaufman to enter into the Agreement by making representations that PFA had made a commitment for life science real estate investment in the amount of $500,000,000.

43) At the time that representation was made, Gliatta knew it was false.

44) Further, Gliatta indiuced Kaufman with the further representation that Thor had excellent long term relationships with major investment funds that would be able to provide additional funding for life sciences real estate or, for any investment not covered by PFA or

requiring more equity than PFA would provide, would be able to cover larger investments or those not covered.

45) At the time she made that claim, Gliatta knew it was false.

46) Because of those false inducements, Kaufman refrained from taking other positions that paid as well or more.

47) As a result, Kaufman was taken out of the life sciences business by Thor and lost profitable job opportunities as a result.

WHEREFORE, Kaufman demanded compensation in the amount of $5,000,000 for having been fraudulently induced to employment with Thor, for loss of business and employment opportunities.

**COUNT II: Breach of Contract**

48) The allegations in ¶¶1-47 are repeated and realleged.

49) Thor drafted the Agreement.

50) Thor provided the guaranteed bonus because it wanted Kaufman, with her decades of experience and contacts in life sciences real estate, to have assurances during the first year. It made those assurance because Kaufman was concerned about the discretion that Thor otherwise reserved for bonuses.

51) Kaufman was not terminated for cause.

52) The guaranteed bonus of $400,000 was unconditionally due to Kaufman after termination under ¶6(b) of the Agreement drafted by Thor.

53) Thor’s termination of the Agreement was less than 30 days before the expiration date of the amendment then in effect.

54) The Separation drafted by Thor provided, in ¶5, that "…any bonuses…due at a later date shall be provided in accordance with the Employer's standard procedures and applicable benefit plan documents."

55) Thor had no procedures or plan documents that would deny benefits, including bonuses, due under the Agreement.

56) Kaufman properly carried out all of her obligations under the Agreement and any amendments thereto, including efforts to raise the capital that Thor lacked, even though that was not her obligation under the Agreement.

57) Thor has never paid the guaranteed bonus.

WHEREFORE, Kaufman demands payment of her $400,000 bonus, with interest, for breach of the Agreement.

**COUNT III: Bad Faith Termination**

58) The allegations in ¶¶1-57 are repeated and realleged.

59) Kaufman did everything she committed to do as Executive Vice President. She brought in over $2,000,000,000 of projects that any sufficiently capitalized company would have been able to close.

60) Those deals were profitable and met or exceeded all of Thor's underwriting objectives, and were instead acquired by other, better capitalized companies.

61) The sole reason for Thor having terminated Kaufman was to deny her the guaranteed bonus.

62) That termination was therefore in bad faith and was undertaken, in both timing and substance, to attempt to deprive Kaufman of $400,000.

WHEREFORE, in the alternative to Count II, Kaufman demands payment of her bonus

in the amount of $400,000, with interest, as well as $5,000,000, for bad faith termination.

**COUNT IV: Promissory Estoppel**

63) The allegations in ¶¶1-62 are repeated and realleged.

64) In the event that the court should find that the Agreement is invalid or does not otherwise apply, Kaufman alleges that she was led to refrain from pursuing other attractive employment opportunities by Thor's representations that (1) it was sufficiently capitalized, (2) that it had a commitment of $500,000,000 from PFR and (3) that, regardless, it would guarantee first year compensation of $800,000.

65) Thor made those representations in bad faith.

66) Thor made those representations with the knowledge that Kaufman would rely on them and terminate any consideration of employment elsewhere, and come to work for Thor.

67) Thor breached those promises in order to induce Kaufman to work for Thor.

68) As a result of those inducements, Kaufman refrained from pursuing other employment opportunities and instead came to work for Thor, assuming that the representations made to here were true.

69) Because those promises and representations were false, Kaufman accepted employment with Thor to her detriment.

WHEREFORE, in the alternative to Counts I-IV, Kaufman demands compensation in the amount of $5,000,000 for lost business opportunities and $400,000 for her unpaid bonus, with interest.

**COUNT V: Breach of Covenant of Good Faith and Fair Dealing**

70) The allegations in ¶¶1-69 are repeated and realleged.

71) Agreements made in New York and Connecticut are subject to an implied covenant of good faith and fair dealing.

72) Thor drafted a detailed employment Agreement that assured Kaufman that (a_ she would receive 30 days notice of termination, (b) that she would receive a guaranteed first year bonus of $400,000 and (c) that the bonus would be paid in the event of termination without cause.

73) Kaufman was terminated without cause.

74) She was terminated less than 30 days before expiration of the then-current amendment to the Agreement.

75) She was not paid her bonus.

76) The termination was in bad faith as her work had been exemplary.

77) The termination was undertaken for the purpose of attempting to deprive her of her bonus.

WHEREFORE, in the alternative to Counts I-IV, Kaufman demands payment of $400,000 for the bonus of which she was unfairly deprived, and $5,000,000 for breach of the covenant of good faith and fair dealing.

**COUNT VI: Fraud**

78) The allegations in ¶¶1-77 are repeated and realleged.

79) On December 5, 2022 Gliatta called Kaufman into her office.

80) At that time, Kaufman was working under an amendment to the Agreement that extended her employment through January 2, 2023.

81) Gliatta claimed that Thor had decided not to be engaged in the life sciences real estate market.

82) She then presented Kaufman with the Separation, dated that day. It evidently had been drafted ahead of time without telling Kaufman.

83) In fact, Thor did not intend to depart from the life sciences business. Since that time, it has made further investments, continued to market properties, and as of the date of this Complaint continues to represent on its website that it is a "leader" in life science.

84) Thor's website claims it has grown its life science business "rapidly" and that it has over 1,000,000 square feet of properties.

85) Thor's claim of departing the life science business was a ruse to conceal its treal purpose: to manage a limited number of investments on the cheap.

86) The timing of Thor's termination was – if in error – designed to deprive Kaufman of her guaranteed bonus, by not having her employed at the time it would be due.

87) It was only by its negligence that it imposed a Separation that filed to meet its objectives.

88) Should the Separation be found by the court to operate to deprive Kaufman of her bonus, that would be the result of Thor's fraudulent pretextual termination.

89) As a matter of law, a termination based on fraud cannot be enforced as it violates public policy as well as being invalid because of its fraudulent purpose.

WHEREFORE Kaufman demands that the Separation be declared null and void as it was obtained by fraud, and that, in the alternative to Counts I-V, Thor be ordered to pay Kaufman her bonus of $400,000, with interest.

**COUNT VII: Breach of Fiduciary Duty**

90) The allegations in ¶¶1-89 are repeated and realleged.

91) Under the Agreement's guaranteed bonus, Thor undertook a duty to Kaufman to implement the agreement in good faith.

92) Because the guaranteed bonus was a central provision and inducement in the Agreement, Thor had a fiduciary duty to Kaufman to honor the Agreement upon termination without cause.

93) Kaufman was terminated without cause in a cynical and dishonest manner that was designed to deprive Kaufman of her bonus.

94) As a result of that breach of its duty to her, Kaufman has suffered the loss of $400,000.

LAURA W. KAUFMAN, Plaintiff

By:

KAUFMAN PLLC

/s/ Alan H. Kaufman

Alan H. Kaufman, Esq.
Bar No. ct 29258

KAUFMAN, PLLC
200 Park Avenue, 17th Floor
New York, NY 10167
Tel: (212) 257-0900
Fax: (212) 897-2370
akaufman2@kaufmanllc.net

888 16th Street NW, Suite 800
Washington, D.C. 20006