# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LAURA KAUFMAN

                     Plaintiffs

        -against-

MELLISSA GLIATTA
THOR EQUITIES LLC, and
JOSEPH J. SITT

                  Defendants.

Civil Action No.: 3:24-cv-1026

---

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND

---

Pursuant to the provisions of Fed. R. Civ. P. 15(a)(2), the plaintiff requests that the Court grant leave to amend her complaint, attached as Exhibit 1. The Rule establishes that "The court should freely give leave when justice so requires."

The Amended Complaint corrects typographic errors in the initial Complaint, incorrect contract paragraph references, eliminates certain counts, clarifies others, and adds a count for declaratory judgment. The eliminated counts were deleted to reduce issues that might otherwise unnecessarily consume motion practice, and therefore should reduce the burden on the Court and the defendants.

Amended complaint requests typically require consideration of potential prejudice to the defendants, the extent to which discovery has been underway, relation back and other factors, depending on how far along a matter has progressed. Those are not a concern here because, as the Court is aware, the defendants have not yet been served.

We ask that the Court grant leave to file the Amended Complaint so that it can be served within the October 15 deadline set by the Court.

LAURA W. KAUFMAN, Plaintiff

By:

KAUFMAN PLLC

 /s/ Alan H. Kaufman

Alan H. Kaufman, Esq.
Bar No. ct 29258

KAUFMAN, PLLC
200 Park Avenue, 17th Floor
New York, NY 10167
Tel: (212) 257-0900
Fax: (212) 897-2370
akaufman2@kaufmanllc.net

888 16th Street NW, Suite 800
Washington, D.C. 20006

# Exhibit 1

# [Proposed Amended Complaint]

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LAURA KAUFMAN

                 Plaintiffs

      -against-

MELLISSA GLIATTA
THOR EQUITIES LLC, and
JOSEPH J. SITT

                Defendants.

Civil Action No.: 3:24-cv-1026

---

## FIRST AMENDED COMPLAINT with JURY DEMAND AS TO SPECIFIED COUNTS

---

This is a Complaint for fraudulent inducement, breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment. Punitive damages are also sought as permitted by New York law. The complaint arises from the bad faith attempt by the defendants to induce the plaintiff into employment based on a guaranteed bonus which they refused to pay, when due, under contracts they drafted.

### Jurisdiction

This court has subject matter jurisdiction under 28 U.S.C. §1332 because the plaintiff and the defendants are domiciled in different states and the amount in controversy exceeds $75,000.

### Parties

1)     Plaintiff Laura Kaufman ("Kaufman") is a Connecticut domicile who resides in Darien, Connecticut.  Kaufman is an experienced real estate executive with extensive experience developing and managing real estate for the life sciences industry.

2)      Defendant Melissa Gliatta is the Chief Operating Officer of defendant Thor Equities LLC ("Thor"). Gliatta is a South Carolina resident and domicile.

3)      Gliatta had been with Thor for more than two decades, works closely with Sitt at Thor and in his preceding business, and made all representations to induce Kaufman to enter into agreements with the full knowledge and consent of Sitt, and at his direction.

4)      Defendant Thor is a Delaware Limited Liability Company based in New York with its principal offices located at 25 West 39th Street, New York, New York.

5)      Defendant Joseph J. Sitt ("Joe Sitt") is the chairman of Thor. He resides in and is a domicile of the state of New York.

## Background

6)      On or about June 11, 2021 Thor engaged Kaufman as Executive Vice President of Thor Sciences, a division of Thor established to enable Thor to  transact life sciences real estate acquisitions and development.

7)      Until Kaufman was hired, Thor had little experience in the field. It had made a small number of acquisitions that were poorly underwritten. Kaufman was previously Vice President of Biomed Realty, a highly respected real estate investment trust acquired in 2015 by Blackstone.

8)      Biomed was and continues to be a global leader in life sciences real estate. As Vice President of Biomed, Kaufman managed over $1 billion of its life sciences real estate portfolio, one of the company's largest.  Prior to that position, Kaufman had been with Lyme Properties, a company that was a founder of the life sciences real estate industry.

9)      Before joining Thor, which had approached her based on her reputation, Kaufman engaged in extensive discussions with Gliatta about potentially joining the company.

10)      During those hours of discussions, Gliatta represented to Kaufman that Thor had a $500,000,000 commitment from a Danish Pension Fund, PFA, for investment in life sciences.

11)      Kaufman questioned Gliatta extensively about that commitment. From her extensive experience, she was aware of the risks of a company that lacked equity to participate in the large acquisitions typical of the industry.

12)      Kaufman emphasized to Gliatta that she was not willing to join a company that lacked assured equity, and was encouraged by Sitt's claim to be a multi-billionaire, which meant that he could independently fund acquisitions if needed.

13)      On numerous occasions, Gliatta assured Kaufman that  apart from the Danish commitment,  Thor had extensive, long-term relationships with major investors and equity providers so that if more equity was needed for projects, it was readily accessible. She said that "the sky is the limit" in terms of Thor's ability to obtain equity.

14)      The latter relationships were purportedly based on Thor's work in office, retail, industrial and other real estate fields, though Thor had little experience with the complex and unique operating needs of life sciences tenants.

15)      The latter are pivotal to success in the field, and Kaufman had extensive experience with their unique needs, expertise that Thor badly needed.

16)      Further, and unknown to Kaufman (and not disclosed by anyone at Thor, including Sitt), Thor's relationships in the investor community were tenuous due to multiple foreclosures on Thor properties.

17)      Also unknown to Kaufman, Thor had failed to pay numerous contractors and consultants (architects, engineers, consulting advisers) who are indispensable to successful underwriting and investment. Sitt was the person responsible for those failures to honor

3

commitments, a problem that later seriously impeded Kaufman's work and created reputational hazards when those services were needed for later investment underwriting.

18)     After reaching an agreement in principle, Kaufman and Gliatta entered into negotiations for the Executive Vice President position.

19)     With very few exceptions, the contract was drafted by Thor's attorneys under Thor's direction.

20)     Because the $400,000 base salary and $400,000 bonus were below market rates and the risk of foregoing other potential opportunities in a burgeoning market, a major negotiating issue was  Kaufman's insistence that her bonus for the first year be guaranteed, with no contingencies of any sort.

21)     Gliatta agreed to the guaranteed bonus ("Bonus"), which was incorporated into ¶4(b) of the Agreement. Exhibit A.

22)     ¶4(b) reads as follows: "The Company shall pay the Executive a performance bonus covering the period of the Start Date through the twelve (12) month anniversary of the Start Date, of no less than $400,000.00 (the "Guaranteed First Year Bonus"), payable within fifteen (15) days after such date, and provided that the Executive is "Actively Employed" by the Company on such payment date."

23)     Further negotiations ensued during which Kaufman insisted that the Bonus be paid even in the event of termination, so long as the termination was not for cause. That assurance was embedded into the Agreement as ¶6(b), which assured its payment.

24)     The Agreement was drafted and signed by Thor in New York and signed by Kaufman in Connecticut.

25)     The Agreement was executed on June 11, 2021.

**Kaufman Sources over $2 Billion in Lucrative Investments**

26)     Kaufman began work on June 14, 2021 and, based on her extensive experience and contacts in the field of life sciences, she was able to quickly identify a broad array of projects.

27)     The underwriting for each project was highly favorable based on the rates of return sought by Thor.

28)     Within the first year, Kaufman identified and sourced projects with a value of over $2,000,000,000.

29)     Shortly after arriving at Thor, Gliatta disclosed to Kaufman that the programmatic agreement with PFA was not yet completed but would be finalized shortly. As it turned out, PFA never finalized its commitment for the $500,000,000 investment, so Thor needed to find individual entities to invest in the more than a dozen projects sourced by Kaufman.

30)     Thor advised Kaufman that if individual investors could not be found, it had over $1 billion on its balance sheet that could be made available so, as directed by Gliatta and Sitt, Kaufman continued to look for attractive projects. As Sitt stated repeatedly, "bring me deals," and Kaufman did.

31)     Thor's lack of available equity,  and Sitt's refusal to use its alleged $1 billion in equity or his considerable personal assets, proved to be highly problematic and ultimately defeated Kaufman's success in finding attractive prospective properties.

32)     Numerous investments could not therefore be consummated and Thor's inability to provide proof of equity became a serious barrier.

33) A particularly embarrassing incident erose when Kaufman learned that Biomed, her previous employer with which she had excellent continuing relations, was looking to sell an attractive portfolio of assets in the San Diego market.

34) Thor put in a bid and Kaufman arranged a conference call with Biomed, which took place during her vacation.

35) The call was an embarrassment for Kaufman, given her long term relationship with the company and its executives. During the call, Sitt was unprepared, unfocused, rambled and spoke in unresponsive generalities about how he liked to "do deals."

36) Sitt failed to provide the specifics Biomed needed about how he could finance Thor's bid and failed to respond to specific questions posed by Biomed. The purpose of the call was for Biomed to be able to perceive Thor as a viable and qualified investor.

37) Despite Kaufman's underwriting that showed that the acquisition would be profitable at a higher price than Thor was willing to bid, Thor put in a "tank the deal" (Sitt's words) low offer and lost the property as a result. Kaufman's underwriting and recommended bid amount would have caused Thor to be selected as the buyer.

38) Thor lost the project when the higher bid, from an entity that showed authentic proof of funds, was accepted.

39) On information and belief, Thor knew it could not provide the needed equity and the low bid was expressly designed to torpedo Kaufman's effort while creating the appearance of being a serious bidder.

40) Further embarrassment occurred with a bid on a property in Pasadena, California, that Kaufman recommended and underwrote to Thor's profit expectations. Thor could not raise capital and refused to provide its own.

41)     When Thor could not find a capital partner, she recommended that Thor pull out of the bidding. But during a Thor investment meeting, Andreas Vlahakis, Sitt's former chief of staff and then-senior vice president for capital markets, told Kaufman to falsely claim to the seller that Thor had three capital partners. Kaufman instead advised the seller that Thor remained interested in the deal but had not yet solidified a capital partner.

42)     Problems with the other sourced projects persisted when Thor's relationships with investors, previously claimed by Gliatta to be strong, lacked the advertised credibility.

43)     All of the sourced projects were, as Kaufman's underwriting had shown, attractive, evidence of which was that the majority of them found a buyer.

44)     When Kaufman spoke with a long time contact with a major potential investor, he said his company would not work with Thor because of Sitt's reputation for "retrading" (a term for reneging on agreements to renegotiate them).

### The Ruse to Avoid Paying the Guaranteed Bonus

45)     On or about June 10, 2022, Gliatta spoke with Kaufman and said that unless Kaufman agreed to modifications of the Agreement, that Thor would terminate her employment that day. She did so on less than 30 days' notice, as required in ¶6(a) of the Agreement.

46)     After amendments to the Agreement unilaterally imposed by Thor as a condition to Kaufman's continued employment, the first of which was in June, 2022 followed by another in August, Gliatta repeated the evasive maneuver. On December 5, 2022 she informed Kaufman, with Sitt's approval, that her employment was terminated (without cause) and that in order to receive the base compensation under Agreement ¶4(a) she would have to sign a Separation Agreement and Release ("Separation"), Exhibit B.

47)     Under the Agreement, Kaufman had the right to her guaranteed bonus of $400,000 because Thor's termination gave less than 30 day's notice as required under 6(a) of the Agreement it drafted.

48)     The deficient notice meant that Kaufman was employed on the due date for payment of the bonus.

49)     Further, ¶11 of the Separation provided that all covenants in the Agreement were designated to survive termination under the Agreement, would continue in effect under the Separation. Agreement ¶6 was one of those surviving covenants.

50)     The Agreement's covenant that the guaranteed bonus under its ¶6(b) therefore remained in full force and effect.

51)     Thor has never paid the guaranteed bonus.

**COUNT I: Fraudulent Inducement (Jury Trial Demanded)**

52)     The allegations in ¶¶1-51 are repeated and realleged.

53)     Gliatta, with the full knowledge, participation and consent of Sitt, induced Kaufman to enter into the Agreement by making false representations that PFA had agreed to provide a programmatic commitment for life science real estate investment in the amount of $500,000,000.

54)     At the time that representation was made, Gliatta and Sitt knew that material representation was false.

55)     Further, Gliatta, with the full knowledge and consent of Sitt, induced Kaufman with the further representation that Thor had excellent long-term relationships with major investment sources that would be able to provide additional equity and debt financing for life

sciences real estate, for any investment not covered by PFA or requiring more equity than PFA could provide.

56)      At the time she made that claim, Gliatta and Sitt knew that it was false.

57)      Because of those false inducements, Kaufman refrained from seeking other positions that paid as well or more.

58)      At the time of the Agreement, life sciences real estate was in a boom era and opportunities for seasoned executives were abundant. As a former Biomed and Lyme executive, Kaufman's credentials were impeccable.

59)      As a result, Kaufman was taken out of the life sciences market by Thor and lost profitable job opportunities as a result, to her substantial detriment.

WHEREFORE, Kaufman demands compensation in the amount of $5,000,000 for having been fraudulently induced to employment with Thor, and for the resulting loss of business and employment opportunities. Kaufman further demands punitive damages under New York law in an amount to be determined by the jury.

**COUNT II:  Breach of Contract**

60)      The allegations in ¶¶1-59 are repeated and realleged.

61)      Thor drafted the Agreement and the Separation.

62)      Thor offered the guaranteed bonus because it wanted Kaufman, with her decades of experience and contacts in life sciences real estate, to have the assurances during the first year that she insisted be part of any agreement.

63)      It made those assurance because Kaufman was concerned about the discretion that Thor otherwise reserved for bonuses.

64)      Kaufman was not terminated for cause.

65)     The guaranteed bonus of $400,000 was unconditionally due to Kaufman after termination under ¶6(b) of the Agreement drafted by Thor.

66)     Thor's termination of the Agreement was less than 30 days before the expiration date of the amendment then in effect.

67)     The Separation drafted by Thor, Exhibit B,  provided in ¶5, that "…any bonuses…due at a later date shall be provided in accordance with the Employer's standard procedures and applicable benefit plan documents."

68)     Thor had no procedures or plan documents that would deny benefits, including bonuses, due under the Agreement and Separation.

69)     Thor similarly threatened to terminate other executives in order to avoid paying its contractual commitments. Such deception was a pattern and practice of Thor.

70)     Kaufman properly carried out all of her obligations under the Agreement and any amendments thereto, including efforts to raise the capital that Thor lacked (or refused to provide), even though that was not her obligation under the Agreement.

71)     Thor has never paid the guaranteed bonus.

WHEREFORE, Kaufman demands payment of her $400,000 bonus, with interest, for breach of the Agreement. Kaufman further seeks punitive damages under New York law in an amount to be determined by the Court.

**COUNT III:  Promissory Estoppel (Jury Trial Demanded)**

72)     The allegations in ¶¶1-71 are repeated and realleged.

73)     Should the court find that ¶¶4(b) and 6(b) of the Agreement are invalid or do not otherwise apply, Kaufman alleges that she was led to refrain from pursuing other attractive employment opportunities by Thor's representations that (1) it was sufficiently capitalized, (2)

that it had a commitment of $500,000,000 from PFR and (3) that, regardless, it would guarantee first year compensation of $800,000.

74)     Thor made those representations, which were clear and unambiguous, in bad faith.

75)     Thor made those representations with the knowledge that Kaufman would rely on them and terminate any consideration of employment elsewhere, and instead come to work for Thor.

76)     Thor made those promises in order to induce Kaufman to work for Thor.

77)     Kaufman was reasonable in relying on those promises, and in reliance on them refrained from pursuing other employment opportunities and instead came to work for Thor, assuming that the representations made to here were true.

78)     Because those promises and representations were knowingly false, Kaufman accepted employment with Thor to her detriment and loss.

WHEREFORE, in the alternative to Counts I-II, Kaufman demands compensation in the amount of $5,000,000 for lost business opportunities and $400,000 for her unpaid bonus, with interest. Kaufman further requests punitive damages under New York law in an amount to be determined by the jury.

**COUNT IV:  Breach of Covenant of Good Faith and Fair Dealing**

79)     The allegations in ¶¶1-78 are repeated and realleged.

80)     Agreements made in both New York and Connecticut are subject to an implied covenant of good faith and fair dealing.

81)     Thor drafted a detailed employment Agreement that assured Kaufman that (a) she would receive 30 days' notice of termination, (b) she would receive a guaranteed first year bonus of $400,000 and (c) that the bonus would be paid in the event of termination without cause.

82)     Kaufman was terminated without cause.

83)     She was terminated less than 30 days before expiration of the then-current amendment to the Agreement.

84)     She was not paid her bonus.

85)     The termination was in bad faith as her work had been exemplary and the termination was timed solely to attempt to avoid honoring the commitment to the $400,000 bonus.

86)     Kaufman later learned that the practice of bad faith terminations to avoid payment commitments, and/or retrading on agreements made, was used by Sitt and Gliatta with other executives, particularly in certain foreign offices where employees had less recourse. Those practices were also used to "retrade" on commitments made to architects, engineers, consultants and even tenants.

87)     The Kaufman termination was undertaken for the purpose of attempting to deprive her of her bonus.

WHEREFORE, in the alternative to Counts I-III, Kaufman demands payment of $400,000 for the bonus of which she was unfairly deprived, and $5,000,000 for breach of the covenant of good faith and fair dealing. Kaufman also requests punitive damages under New York law in an amount to be determined by the Court.

**COUNT V:  Declaratory Judgment**

88)     The allegations in 1-87 are repeated and realleged.

89)     Under the Agreement it drafted, Thor unconditionally agreed in ¶4(b) to pay Kaufman a guaranteed bonus of $400,000.

90) Under ¶6(b) that obligation survived the termination because Kaufman was not terminated for cause.

91) Under the Separation, the commitment to pay the bonus continued.

92) Thor has failed to meet its commitments by failing to pay the guaranteed bonus.

WHEREFORE, Kaufman request that the Court enter a declaratory judgment establishing and confirming that Thor is obligated to pay Kaufman the guaranteed bonus.


LAURA W. KAUFMAN, Plaintiff

By:

KAUFMAN PLLC

 /s/ Alan H. Kaufman

Alan H. Kaufman, Esq.
Bar No. ct 29258

KAUFMAN, PLLC
200 Park Avenue, 17th Floor
New York, NY 10167
Tel: (212) 257-0900
Fax: (212) 897-2370
akaufman2@kaufmanllc.net

888 16th Street NW, Suite 800
Washington, D.C. 20006

# Exhibit A

# [Employment Agreement]

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") by and between Thor Equities, LLC on behalf of itself, its affiliates. related entities, subsidiaries, successors, and assigns (the "Company").and Laura Kaufman ("Executive"), who together with the Company are collectively referred to as the parties to this Agreement ("Parties"), is hereby entered into and effective as of June 11, 2021 (the "Effective Date").

## RECITALS

**WHEREAS**, the Company desires to engage the services of the Executive and the Executive desires to be employed by the Company;

**WHEREAS**, the Company desires to be assured that the unique and expert services of the Executive will be substantially available to the Company, and that the Executive is willing and able to render such services on the terms and conditions hereinafter set forth; and

**WHEREAS**, the Company desires to be assured that the confidential information and good will of the Company will be preserved for the exclusive benefit of the Company;

NOW, THEREFORE, in consideration of such employment and the mutual covenants and promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive agree as follows:

1.    <u>Employment and Position</u>. The Company hereby employs the Executive as its Executive Vice President-Life Science for its business located at 25 West 39th Street, New York, NY 10018, and the Executive hereby accepts such employment under, and subject to, the terms and conditions hereinafter set forth. The Executive's initial date of employment shall be June 14, 2021 (the "Start Date").

2.    <u>Term</u>. The Executive is an employee at will. The Company may, with or without cause, for any reason or no reason at all, unless prohibited by law, terminate the Executive's employment and this Agreement at any time by giving notice to the Executive as set forth in Section 6. The Executive may terminate this Agreement and her employment at any time by giving notice to the Company as set forth in Section 6. Notwithstanding anything herein to the contrary, the Executive acknowledges that this Agreement is not a promise by the Company of continued employment and the Executive shall remain at all times an Executive at will.

3.    <u>Duties</u>. The Executive shall perform services to be designated by the Company and shall initially have the title of Executive Vice President-Life Science, and be responsible for overseeing all aspects of the Company's and the Company's Affiliates' (as defined below) life science-related businesses, including deal sourcing, asset management, development and leasing,

and shall include participation in the launch of the Company's life science business in Europe. The Executive shall report to the Chief Operating Officer of the Company, or such person's designee. The Executive hereby agrees to devote substantially all of her time, attention and best efforts during normal business hours to the faithful performance of such duties and to the promotion and forwarding of the business and affairs of the Company. It is understood and agreed that the Executive will be required to work a minimum of a five (5) day work week, and may be required to work beyond regular office hours as well as make herself available evenings and weekends. Without the prior approval of the Company, Executive shall not, during her employment with the Company, engage in any other business activity pursued for gain, profit or other pecuniary advantage which would interfere with the performance of Executive's duties hereunder . The foregoing limitations shall not be construed as prohibiting Executive from making personal investments or engaging in civic activities that do not impair Executive's ability to carry out Executive's duties hereunder.

4.    Compensation.  The Company shall compensate Executive as follows:

a.    Base Salary.  In consideration of the services rendered by the Executive under this Agreement, the Company shall pay the Executive a base salary (the "Base Salary") at the rate of $400,000.00 per calendar year. The Base Salary will be payable in accordance with the Company's normal payroll practices in effect from time to time, less applicable taxes, deductions and withholdings, as well as set-off against any amounts Executive owes the Company, and prorated for any partial year. The Base Salary may be adjusted at the sole and absolute discretion of the Company, but such Base Salary shall not be reduced.

b.    Discretionary Performance Bonus.  The Company shall pay the Executive a performance bonus covering the period of the Start Date through the twelve (12) month anniversary of the Start Date, of no less than $400,000.00 (the "Guaranteed First Year Bonus"), payable within fifteen (15) days after such date, and provided that the Executive is "Actively Employed" by the Company on such payment date  For purposes of this Agreement, "Actively Employed" means that Executive is employed by the Company and in good standing with the Company, and must not have been suspended, terminated for Cause (as defined), resigned or given notice of intent to resign as of the date the bonus payment is due to be paid. Executive may be eligible to earn subsequent annual performance bonuses, the timing and amount of which shall be in the Company's sole and absolute discretion.

c.    Promote Bonus.  Executive shall be entitled to receive a Promote Bonus as defined in, and subject to the terms and conditions set forth in, Annex A attached hereto.

5.    Benefits.  In addition to the compensation detailed in Section 4 of this Agreement, the Executive shall be entitled to the following additional benefits:

a.    Paid Vacation.  Executive shall be entitled to three (3) weeks paid vacation per calendar year, to be taken in accordance with the Company's policies and procedures in effect from time to time.

000263-240/00287143-1                    2

b.  <u>Paid Time Off.</u>  In addition to the vacation period, Executive shall be entitled to paid time off of up to fifteen (15) days per calendar year, to be taken in accordance with the Company's policies and procedures in effect from time to time.

c.  <u>Insurance Coverage</u>.  Executive shall be entitled to participate in the Company's medical plans and any other plans currently in effect or which may hereafter be adopted by the Company; provided that Executive shall be entitled to the same coverage (which may include a co-pay) as will be made payable to all of the other employees of the Company who are at the same level of management as Executive. Eligibility requirements for the benefit plans are based on the terms of the Company or insurance policies and/or plan documents that administer such policies or plans. Without limiting the foregoing, nothing in this Agreement shall preclude the Company from, in its sole discretion, terminating or amending any employee benefit plan or program from time to time. The Executive shall be subject to any designated premium contributions in accordance with the Company 's policies and procedures in effect from time to time.

d.  <u>Reimbursement of Expenses</u>. The Company shall reimburse the Executive for all reasonable and necessary business expenses incurred by the Executive, all subject to and in accordance with the Company's policies and procedures in effect from time to time.

6.  <u>Termination</u>.

a.  Either Party may terminate this Agreement and Executive's employment any time by giving thirty (30) days' written notice to the other Party. In such event, the Executive shall, at the sole discretion of the Company, either (a) continue to render her services, and be paid her Base Salary in accordance with Section 4, up to the effective date of her termination, or such earlier date set by the Company; or (b) immediately cease her employment with the Company, and receive no compensation from the Company thereafter, except as expressly provided for below.

b.  If Executive's employment with the Company is terminated for any reason other than (i) by the Company for Cause (as defined below) or (ii) by the Executive's resignation, including the Executive's death or Disability, the Executive shall be entitled to receive (1) any unpaid Base Salary under Section 4(a) plus reimbursement due under Section 5(d) through the date of termination; (2) Base Salary for the ninety (90) day period after the termination date, paid on the same basis as provided for in Section 4(a); (3) any unpaid Guaranteed First Year Bonus due under Section 4(b) and (4) such Promote Bonuses (as defined in Annex A ) as to Bonus Eligible Projects set forth on Schedule 1 thereto as of the date of such termination whenever Thor Promote Distributions (as defined in Annex A) are thereafter received equal to the product of (x) the applicable Thor Promote Distribution multiplied by (y) the Applicable Promote Bonus Percentage (as defined in Annex A) multiplied by (z) the Vesting Percentage (as defined in Annex A) calculated as to each applicable Bonus Eligible Project (as defined in Annex A) as of the date Executive is terminated or resigns, provided that as a condition to the receipt of the amounts set forth in subclause (2), (3) and (4) above, Executive must not be in breach of any of her covenants

under this Agreement and the Executive must execute a general release in favor of the Company and its affiliates at termination (which release has become effective and irrevocable after any required waiting periods) in such form as reasonably requested by the Company. The Company will execute a general release of the Executive at the same time as the release referenced in the preceding sentence is executed in favor of the Company

c.      If Executive's employment with the Company is terminated by the Company for Cause or if the Executive resigns for any reason, including the Executive's death or Disability (i) any unpaid Base Salary and reimbursement due under Section 5(d) through the date of termination and (ii) Executive shall forfeit the right to receive any future Promote Bonus from and after the date of such termination or resignation and the Company and/or any applicable Affiliate thereof shall be entitled to retain all future Thor Promote Distributions it may ever receive on account of any Bonus Eligible Project. For the avoidance of doubt, in the event of Executive's termination for Cause, Executive will forfeit the right to receive any future Promote Bonus on account of any Bonus Eligible Project regardless of the Vesting Percentage applicable to such Bonus Eligible Project.

d.      For purposes of this Agreement, "Cause" shall mean, with regard to Executive's termination of employment or affiliation with the Company or a Company Affiliate, the following: (i) Executive's insubordination, (ii) an action by the Executive involving dishonesty, willful misconduct, fraud, embezzlement or any other crime in connection with her employment with the Company, (iii) Executive's conviction of or plea of guilty or nolo contendre to a felony or any other crime involving moral turpitude, whether or not in connection with the Company or any Company Affiliate; (iv) Executive's gross negligence in performing her duties, (v) any act or omission by Executive, whether occurring prior to or during her employment, including without limitation, any activity on social media sites, or harassing, discriminatory or other inappropriate conduct, that results in, or in the good faith judgment and reasonable opinion of the Company may result in, economic, reputational or other harm to, or public disgrace, embarrassment, disrepute or negative publicity for, the Company or any of its Affiliates or any of its or their respective businesses, shareholders, members, partners, officers, investors, clients, contractors, advisors, agents, directors, managers and employees, funds, or properties or other assets; (vi) the use of drugs or alcohol (legal or illegal) in any way which impacts Executive's ability to perform her duties; (vii) the Executive's refusal to perform her duties or responsibilities for any reason, (viii) Executive's failure to work on a full time basis beyond any paid vacation (Section 5(a)) and Paid Time Off (Section 5(b)), and/or (ix) any breach or threatened breach by Executive of the terms of the Agreement or any of the Company's policies or employee handbook as in effect from time to time, which policies and handbook in such form as in effect as of the Effective Date has been provided to the Executive.

e.      <u>Effect of Termination</u>. Upon the Executive's termination of employment, all rights and obligations of the Company and Executive under this Agreement shall cease, except that Sections 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 21 and 22 shall survive any termination of this Agreement or cessation of Executive 's employment hereunder for the periods stated therein.

7.    Confidentiality; Non-Interference and Non-Solicitation.  Executive acknowledges that she has read and understands the terms of this Section 7, and the execution and delivery of this Agreement, and all of its restrictive covenants contained herein, is integral consideration for the Company's execution and delivery of this Agreement. The Executive agrees to be bound by and adhere to all of the terms of this Section 7. The term "Affiliate" shall mean, with respect to any Entity (as defined below) or person which, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the applicable Entity. For purposes of the definition of Affiliate, "control," when used with respect to any Entity, means the power to direct the management and policies of such specified Entity, directly or indirectly, whether through the ownership of voting securities, by contract or as a matter of law, and the terms "controlling" and "controlled" have meanings correlative to the foregoing. The term "Entity" shall mean any general partnership, limited partnership, corporation, joint venture, trust, business trust, real estate investment trust, limited liability company, limited liability partnership, cooperative or association.

a.    Nondisclosure. Executive will not, at any time during or after the term of Executive's employment with the Company, disclose, use for Executive's own benefit or purposes or the benefit or purposes of any other person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise other than the Company and/or any of the Company's Affiliates, or retain any of the Company's or its Affiliates' Confidential Information (as defined below) "Confidential Information" shall mean information about the Company, its Affiliates and their partners, investors and businesses including but not limited to, any business plans, methods and procedures, trade secrets, vendor, supplier, customer, investor, joint venture partner or client lists or information, executive lists or information, information regarding project development, marketing and operating plans and strategies, acquisition, leasing and other agreements, management organization information, operating policies or manuals, performance results, credit and financial data, or other financial, commercial, business or technical information, that the Executive may have learned in connection with her employment with the Company; Executive's obligations in respect of Confidential Information shall continue until such Confidential Information becomes generally available from public sources through no fault of Executive or anyone acting on her behalf. Notwithstanding the foregoing, Executive shall be permitted to disclose Confidential Information only to the extent as may be required by subpoena or governmental order or other requirement, provided that Executive first promptly notifies the Company of such subpoena, order or requirement in order for the Company to have the opportunity to seek a protective order or other appropriate remedy and cooperate with the Company (at the Company's cost and expense) in obtaining such order or remedy. Confidential Information shall not include such portions of the Confidential Information which: (i) are or become generally available to the public other than as a result of a disclosure by Executive or her agents or representatives; (ii) can be documented as being in Executive's possession prior to the date received from the Company; or (iii) becomes available to Executive on a non-confidential basis from a source (other than the Company or its Affiliates or their respective representatives or agents) that is not known by the Executive to be prohibited from such disclosure because of the source's legal, contractual or fiduciary obligation.

000263-240/00287143-1                          5

b. <u>Non-Solicitation; Non- Interference</u>. Executive will not, at any time during the term of her employment with the Company, and for a period of two (2) years after the termination of Executive' s employment with the Company for any reason whatsoever, including whether Executive's employment is terminated by the Company with or without cause, or the Executive resigns:

(i) Solicit, hire, recruit, employ or engage, or seek to solicit, hire, recruit, employ or engage, or assist anyone else to solicit, hire, recruit, employee or engage, any person who is then or at any time during the preceding one year was (i) in the employ of the Company or any of the Company's Affiliates or (ii) an independent contractor who then or at any time during the preceding one year provided any service in connection with the business of the Company or any of the Company's Affiliates.

(ii) Solicit, induce, or disrupt, or attempt to solicit, induce, or disrupt, directly or indirectly, (i) any customer, client, tenant, partner, shareholder, member, investor, broker, banker, independent contractor, vendor, or supplier of the Company or any of the Company's Affiliates to cease doing business with the Company and/or any of the Company's Affiliates or to materially alter its business relationship with the Company and/or any of the Company's Affiliates, or (ii) any customer, client, tenant, broker, independent contractor, vendor or supplier of the Company or any of the Company's Affiliates to do business with the Executive or any other third party engaged in the business of real estate development, acquisition, sales, or leasing..

(iii) Interfere with, disrupt or attempt to interfere or disrupt any relationship, contractual or otherwise, between the Company or any of the Company's Affiliates and any of their respective shareholders, members, partners or investors.

(iv) Solicit, induce, or attempt to induce, directly or indirectly, any investor in or joint venture partner of the Company and/or any of the Company's Affiliates, to invest in or become a joint venture partner of an entity other than the Company or any of the Company's Affiliates. The restrictions in this subparagraph apply only if (i) Executive did not have a pre-existing relationship with such investor or joint venture partner, or (ii) the Company's or Company's Affiliates' relationship with such investor or joint venture partner was not originally established in whole or in part by the Executive's efforts on the Company's or Company's Affiliates' behalf.

(v) Executive shall not, directly or indirectly (i) engage in, use, offer or disclose to any person or entity any real estate or investment transaction or potential real estate or investment transaction that the Company or any of its Affiliates reviewed, engaged in, solicited or attempted to engage in during the three (3) year period prior to termination ("Restricted Property") and (ii) communicate with anyone that has an existing equity, debt or other interest in the Restricted Property or purchase or acquire the Restricted Property or an equity, debt or other interest in the Restricted Property

.

8.      <u>Assignment of Inventions; Works of Authorship</u>.

a.      <u>Inventions</u>. The Executive agrees to assign and transfer to the Company or its designee, without any separate remuneration or compensation, her entire right, title and interest in and to all Inventions in the Field (as defined below), together with all United States and foreign rights with respect thereto, and at the Company's expense to execute and deliver all appropriate patent and copyright applications for securing United States and foreign patents and copyrights on Inventions in the Field and to perform all lawful acts, including giving testimony, and to execute and deliver all such instruments that may be necessary or proper to vest all such Inventions in the Field and patents and copyrights with respect thereto in the Company, and to assist the Company in the prosecution or defense of any interference which may be declared involving any of said patent applications, patents, copyright applications or copyrights.   For the purposes of this Agreement, the words "Inventions in the Field" shall include any discovery, process, design, development, improvement, application, technique, or invention, that is patentable or copyrightable or otherwise reasonably classifiable as a trade secret, so long as the aforementioned are t, conceived or made by the Executive, individually or jointly with others within the scope of her employment, on the Company's premises or during normal working hours and while in the employ of the Company, and which was or is directly or indirectly related to the business of the Company or any of its subsidiaries, or which resulted or results from any work performed by any Executive or agent thereof during the time in which Executive was employed by the Company.

b.      <u>Works for Hire</u>. Any Inventions in the Field, including, without limitation, sales approaches, sales material, training material, computer software, documentation, other copyrightable works or any other intellectual property made, conceived, created, developed or contributed to by Executive during her employment with the Company which (1) directly relate to the business, operations or activities of the Company (or any of its Affiliates) or Executive 's employment with the Company, or (2) are based upon Confidential Information shall be considered "works made for hire" under the copyright laws of the United States (collectively "Works For Hire ") and Executive shall communicate all information, details and data pertaining thereto to the Company in such form as the Company requests. To the extent that any such Works for Hire fail to qualify as "works made for hire" under the copyright laws of the United States or any other jurisdiction, Executive hereby assigns each such Work for Hire and property and all rights therein in any jurisdiction to the Company. Whenever Executive is requested to do so by the Company, during or after Executive's employment with the Company, Executive shall execute any assignments or other documents reasonably deemed necessary by the Company to confirm or effectuate full and exclusive ownership of Works for Hire in the Company, including, but not limited to, ownership of any moral rights under the copyright law of any nation, or any other rights under the intellectual property laws of any nation. The obligations set forth in this Section 8(b) shall be binding upon the successors, assigns, executors, administrators and other legal representatives of Executive.

9.      <u>Return of Documents</u>. All notes, letters, documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its

Affiliates and any copies, in whole or in part, thereof (collectively, the "Documents"), whether or not prepared by the Executive, shall be the sole and exclusive property of the Company. The Executive shall safeguard all Documents and shall surrender to the Company at the time her employment terminates, or at such earlier time or times as the Company may specify, all Documents then in the Executive 's possession or control.

10.      Assignment: Binding Effect. Executive understands that Executive has been selected for employment by the Company on the basis of Executive's personal qualifications, experience and skills. Executive agrees, therefore, that Executive cannot assign all or any portion of Executive's performance under this Agreement. The Company may assign this Agreement to any successor, affiliate or subsidiary of the Company or to any new company provided that the successor, affiliate, subsidiary, or new company agrees to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

11.      Non-Disparagement. Executive shall not criticize, defame, be derogatory towards, or otherwise disparage or denigrate the Company or its Affiliates (or the Company's or its Affiliates past and present officers and directors, partners, investors, owners, lenders, agents, representatives, employees or affiliates), or its or their business, projects, properties or marketing plans or actions to any third party, either orally or in writing at any time; provided, however, that this provision will not preclude the Executive from giving truthful testimony as required to respond to a lawful subpoena. The Company and its Executives shall not criticize, defame, be derogatory towards or otherwise disparage or denigrate the Executive, either orally or inwriting at any time; provided, however, that this provision will not preclude the Company and its Affiliates and its and their respective employees from giving truthful testimony as required to respond to a lawful subpoena.

12.      Cooperation with Regard to Litigation. Executive agrees to cooperate with the Company at all times (including following her termination of employment) by making herself reasonably available to testify on behalf of the Company or its Affiliates, in any action, suit or proceeding, whether civil, criminal, administrative, or investigative and to assist the Company or any of its Affiliates in any such action, suit, or proceeding by providing information and meeting and consulting with the Company or its representatives or counsel or representatives or counsel to the Company or its Affiliates, as reasonably requested by the Company or such representatives or counsel for matters arising out of Executive's performance of her duties. Executive shall be reimbursed by the Company for any reasonable out-of-pocket expenses incurred by Executive in connection with her compliance with the foregoing covenant, including, but not limited to, legal fees to the extent that the Executive reasonably believes that separate representation is warranted.

13.      Complete Agreement.

a.      Executive acknowledges and represents that she currently has no other oral or written representations, understandings or agreements with the Company or any of its members,

managers, officers or representatives covering the same subject matter as this Agreement. This Agreement is the final, complete and exclusive statement and expression of the agreement between the Company and Executive concerning the employment of Executive by the Company and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements. This written Agreement may not be later modified except by a further writing signed by a duly authorized officer of the Company and Executive, and no term of this Agreement may be waived except by writing signed by the Party waiving the benefit of such term. Without limiting the generality of the foregoing, either Party's failure to insist on strict compliance with this Agreement shall not be deemed a waiver thereof.

        b.    Executive represents that she is not restricted by any other employment contract or encumbered by any other obligation that would restrict, prohibit or affect her obligations as Executive Vice President-Life Science hereunder and shall indemnify the Company should any claim or action arise as a result of a breach of this covenant.

    14.    <u>Notice</u>. Whenever any notice is required hereunder, it shall be given in writing addressed as follows:

> To the Company:
> **THOR EQUITIES, LLC**
> 25 West 39th Street
> New York, NY 10018
>
> Attn: Carol Nardozza
>
> To the Executive:
> 38 Delafield Island Road
> Darien, Connecticut 06820

Notice shall be deemed duly given and effective (i) when personally delivered by hand, (ii) when transmitted by facsimile (on the date of confirmation of receipt) subject to a confirmation copy sent via overnight courier, (iii) on the next business day when delivered by national overnight courier service, or (iv) on the third business day after the date deposited in the mail addressed as above set forth and sent first class mail. registered or certified, return receipt requested. Either Party may change the address for notice by notifying the other Party of such change in accordance with this Section 14 and such notice must be certified return receipt requested.

    15.    <u>Section 409A</u>. This Agreement is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), including the exceptions thereto, and shall be construed and administered in accordance with such intent. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an

000263-240/00287143-1        9

involuntary separation from service, as a short-term deferral, or as a settlement payment pursuant to a bona fide legal dispute shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, any installment payments provided under this Agreement shall be treated as a separate payment. To the extent required under Section 409A, any payments to be made under this Agreement in connection with a termination of employment shall only be made if such termination constitutes a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company. makes no representations that the payments and benefits provided under this Agreement comply with Section 409A and in no event shall it be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by you on account of non-compliance with Section 409A.

16.     Waiver of Breach. A waiver by the Company or the Executive of any breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any other or subsequent breach by the other Party.

17.     Severability: Enforceability. If it is determined by a court of competent jurisdiction in any state that any restriction contained herein is excessive in duration or scope or is unreasonable or unenforceable under the laws of that state, it is the intention of the Parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state.  If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.

18.     Executive's Acknowledgments; Specific Performance. Executive specifically acknowledges that the restrictions contained in Sections 7, 8 and 11 of this Agreement are reasonable and necessary to preserve the Company's legitimate economic interests. The Executive also agrees that the Company's and its Affiliates' remedies at law for a breach or threatened breach of any of the provisions of such covenants would be inadequate and the Company and its Affiliates would suffer irreparable damages as a result of such breach or threatened breach, and that in the event of such a breach or threatened breach, in addition to any rights or remedies at law, the Company and/or its Affiliates, without the need to post any bond or prove or show actual damages, shall  be entitled to  equitable relief in the form of specific performance, a temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.  The Executive further agrees that if the Company seeks equitable relief for a violation of this Agreement, Executive will not challenge an assertion by the Company that her violation of any of the restrictions contained in this Section 7 would result in immediate and irreparable harm to the Company and that monetary damages would not be adequate to remedy such harm.

19.     Withholding. The Company shall be entitled to withhold from any amounts to be paid or benefits provided to the Executive hereunder any federal, state, local, or foreign withholding or other taxes or charges which it is from time to time required to withhold. The Company shall be entitled to rely on an opinion of counsel if any question as to the amount or requirement of any such withholding shall arise.

20.     <u>Captions</u>.  Captions herein have been inserted solely for convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement.

21.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and shall have the same effect as if the signatures hereto and thereto were on the same instrument.

22.     <u>Governing Law; Venue</u>.  The Parties agree that the validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of New York, without regard to conflict of laws principles of such State.  The Parties further agree that the exclusive forum for any litigation in connection with this Agreement shall be a state or federal court sitting in New York County, New York, and the Parties hereto hereby submit to the exclusive jurisdiction of such courts.

23.     **<u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT, OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY DISPUTE BETWEEN THE PARTIES HERETO**

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement effective for all purposes as of the date first set forth above.

EMPLOYER:

THOR EQUITIES, LLC

By: _____

Name: _MELISSA B. GLIATTA_

Title: _COO_

EXECUTIVE:

_____

LAURA KAUFMAN

## ANNEX A

## PROMOTE BONUS FOR LAURA KAUFMAN

## ARTICLE I
## DEFINITIONS

The following definitions shall apply to this Annex A.  Any defined terms used in this Annex A without definition shall have the meaning as set forth in the Agreement to which this Annex A is attached.

1.1.   **"Applicable Promote Bonus Percentage"** shall mean three percent (3%) of the Thor Promote Distributions.

1.2.   **"Bonus Eligible Project"** shall mean a Life Science Project in which the Company or any Affiliate thereof, acquires a direct or indirect interest, via one or more Entities selected and formed by the Company, in its sole discretion, and which is designated by the Company as a Life Science Project sourced through a broker or in an off market transaction, and with respect to which Executive played a material role in the negotiation of the purchase of the Life Science Project and the closing of the purchase of the Life Science Project.  All Bonus Eligible Projects shall be set forth on Schedule 1 hereto and such Schedule 1 shall be updated jointly by the Company, from time to time, to reflect the addition of additional Bonus Eligible Projects.  The Parties agree and acknowledge that no projects or properties owned or operated by the Company or any of its Affiliates as the date hereof shall be a Bonus Eligible Project.

1.3   **"Bonus Eligible Project Agreements"** means the limited liability or other such similar agreements pursuant to which the Company or any Company Affiliate and any other investors hold direct or indirect interests in any Bonus Eligible Project.

1.4   **"Disability"** shall mean with regard to the Executive's termination of employment or consultancy with the Company, the following: (a) in the case where the Company maintains a disability plan or policy that covers the Executive, "disability" as defined under such plan or policy (or as may otherwise be defined in any employment or consulting agreement between the Company and the Executive) or (b) in the case where the Company does not maintain such a plan or policy, a termination of employment or consultancy as a result of the Executive's physical or mental illness or incapacity that prevents the Executive from performing her duties for a cumulative period of 45 days (whether or not consecutive) in any 12-month period.

1.5   **"Life Science Project"** shall mean real estate located in North America, Asia or Europe in which the business conducted thereon is, or is to be primarily related to, biotech, pharmaceutical and medtech laboratories, research and development facilities, offices and related uses.

**1.6** **"Thor Promote Distributions"** shall mean, with regard to any Bonus Eligible Project, the amount distributed to, and actually received by, the Company or any Company Affiliate, with respect to its membership, partnership or similar interest in any Entity that is a member or partner in any such project, that exceeds the applicable Company or Affiliate percentage interest therein based on capital contributions.  For the avoidance of doubt, Thor Promote Distributions shall specifically exclude any sums paid to the Company or any Company Affiliate on account of any property management, asset management, leasing, leasing management, development, investment management, construction management, acquisition fees or the like.

**1.7** **"Vesting Percentage"** shall mean, as to any Bonus Eligible Project, a fraction, expressed as a percentage, (x) the numerator of which is the number of consecutive, full 12 month periods following the closing of the acquisition of the applicable Bonus Eligible Project that Executive has been continuously employed by the Company or any applicable Affiliate thereof and (y) the denominator of which is five (5).  By way of example only, if Executive's employment is terminated fifteen (15) months after the acquisition of any Bonus Eligible Project on Schedule 1, the Vesting Percentage applicable to such Bonus Eligible Project would be twenty percent (20%) (1/5).  Notwithstanding the foregoing, if at any time after the three (3) year anniversary of the acquisition of a Bonus Eligible Project such Bonus Eligible Project is sold, and if Executive is at the time of such sale Actively Employed by the Company, the Vesting Percentage related to such of Bonus Eligible Project shall be one hundred percent (100%).

## ARTICLE II
## BONUS

**2.1.** **Promote Bonus.** (a) Subject to the terms set forth in the Agreement, including this Annex A, upon receipt by the Company or any Company Affiliate of Thor Promote Distributions, solely on account of its ownership of direct and/or indirect interests in Bonus Eligible Projects, Executive shall be entitled to receive a Promote Bonus equal to the difference of (A) the product of (i) the applicable Thor Promote Distribution multiplied by (ii) the Applicable Promote Bonus Percentage multiplied by (iii) the Vesting Percentage.  For example, if the Company is paid a Thor Promote Distribution in the amount of $1,000,000 on account of any Bonus Eligible Project within the 15 months of the acquisition of such project, the Promote Bonus payable shall be (A) $1,000,000 multiplied by (B) 3% (i.e., the Applicable Promote Bonus Percentage) multiplied by (C) 20% (i.e., the Vesting Percentage).  For the avoidance of doubt, the value of any Promote Bonus will never be less than zero and, in the event that the foregoing calculations yield a negative number, no sums shall be due and owing (on account of such calculation) from the Executive to the Company.

**2.2.** **Payment.** Any Bonus earned by Executive hereunder shall be paid to her, in cash, by the Company or any applicable Company Affiliate, no later than thirty (30) days after its receipt of any applicable Thor Promote Distributions

2.3.    **Certain Rights and Conditions**,

2.3.1`    It is expressly understood and agreed that if and to the extent that any Bonus Eligible Project Agreements contain provisions pursuant to which the Company or any Company Affiliates may forfeit the right to receive Thor Promote Distributions or have the amount of the Thor Promote Distributions diluted on account of any circumstances or occurrences whatsoever or howsoever arising, including as a result of the removal of the Company or any Company Affiliate for cause or failure to fund capital then in the event that such Thor Promote Distributions are so forfeited or diluted pursuant to the terms of such Bonus Eligible Project Agreements, Executive shall have no claim or cause of action whatsoever against the Company or any Company Affiliate for any monies that she would have received on account of such forfeited or diluted Thor Promote Distributions, regardless of the reason that such Thor Promote Distribution is forfeited.  Additionally, Executive shall have no claim or cause of action whatsoever against the Company or any Company Affiliate based on the performance of the Company or its Affiliates in managing or operating a Bonus Eligible Project or the terms or timing that the Company or any Company Affiliate decides to sell or finance the Bonus Eligible Project which performance or decision could reduce the amount of the Thor Promote Distribution.  All such decisions with respect to the management of the Bonus Eligible Project and the sale and financing of the Bonus Eligible Project may be made in the sole and absolute discretion of the Company and any Company's Affiliate and the Company and any Company Affiliate owes no fiduciary duty to Executive and may engage in any activity, including activities that are competitive with the Bonus Eligible Project.

2.3.2    `For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing contained in the Employment Agreement, including this Annex A, shall in any way limit the right of the Company, or any Company Affiliate thereof, to, at any time and for any reason (i) decline to pursue any particular Life Science Project or other project; (ii) abandon any transaction relating to any Life Science Project, any other project or any Entity; (iii) sell, pledge, mortgage, hypothecate or otherwise encumber or dispose of any interest (direct or indirect and in whatever form) in any Life Science Project or any other project; or (iv) cause any real property relating to any Life Science Project or any other project to be sold, financed, refinanced, pledged, mortgaged, hypothecated or otherwise disposed of , in each case, whether or not such Life Science Project or other project constitutes a Bonus Eligible Project and regardless of the impact such decision may have as to the ability of the Company or any Company Affiliate to receive Thor Promote Distributions.

2.4.    **Repayment Obligations.** If the Company or any Company Affiliate becomes obligated to return all or any portion of the Thor Promote Distribution on account of any circumstances or occurrences whatsoever or howsoever arising, including without limitation as a result of the removal of the Company or any Company Affiliate for cause or failure to fund capital, then in the event that such Thor Promote Distributions are so returned pursuant to the terms of

such Bonus Eligible Project Agreements, Executive shall have no claim or cause of action whatsoever against the Company or any Company Affiliate or any of their respective owners, owners, employees or agents for any Promote Bonus, and Executive must return to the Company the Applicable Promote Bonus Percentage of any Thor Promote Distribution that is required to be returned for any reason within thirty (30) days of receipt of notice that such return is required.

**SCHEDULE 1**
**TO ANNEX A**
**LIST OF BONUS ELIGIBLE PROJECTS**

**None as of the Effective Date**

# Exhibit B

# [Separation Agreement]

## SEPARATION AGREEMENT & RELEASE

December 5, 2022

Laura Kaufman
38 Delafield Island Road
Darien, CT 06820

Re:     Separation Agreement & Release

Dear Laura:

This letter confirms that on December 5, 2022, I personally delivered to you the enclosed Separation Agreement & Release. You have up to 21 days after receipt of this Separation Agreement & Release to consider whether to sign and date this Separation Agreement & Release, in which you waive important rights, including those under the Age Discrimination in Employment Act of 1967. We advise you to consult with an attorney of your choosing prior to signing this Separation Agreement & Release concerning the rights you are waiving as well as all other terms of this Separation Agreement & Release.

Very truly yours,

Melissa Gliatta
Chief Operating Officer
Thor Equities LLC

## SEPARATION AGREEMENT & RELEASE

**Thor Equities, LLC** and **Laura Kaufman**, Employee's heirs, executors, administrators, successors, and assigns (collectively referred to throughout this Agreement as "Employee"), agree that:

1.  **Last Day of Employment.**  Employee's last day of employment with Thor Management Company, LLC is December 5, 2022.

2.  **Consideration.**  In consideration for signing this Separation Agreement & Release, and complying with its terms, Thor Management Company, LLC agrees:

     a.     to pay to Employee one hundred thirty-eight thousand, four hundred sixty-one dollars and fifty-four cents ($138,461.54), representing ninety (90) days of salary at Employee's base rate of pay, less lawful deductions, in accordance with Thor Management Company LLC's regular payroll procedures and dates; and

     b.     Employee's medical coverage will continue through and including December 31, 2022.  Thereafter, Employee, if then eligible, may elect COBRA coverage for the available COBRA period, at Employee's own expense.

3.  **No Consideration Absent Execution of this Agreement.**  Employee understands and agrees that Employee would not receive the monies and/or benefits specified in paragraph "2" above, except for Employee's execution of this Separation Agreement & Release and the fulfillment of the promises contained herein and no other sums are due and payable or otherwise owing to Employee as a result of this Agreement or any other employment or other agreement between Employee and Thor Equities, LLC or any affiliate thereof.

4.  **General Release of All Claims**.  Employee knowingly and voluntarily releases and forever discharges Thor Management Company, LLC, its parent corporation, Thor Equities LLC and all affiliates, subsidiaries, divisions, predecessors, insurers, co-employers, successors and assigns, and their current and former employees, attorneys, officers, directors and agents thereof, both individually and in their business capacities, and their employee benefit plans and programs and the trustees, administrators, fiduciaries and insurers of such plans and programs (collectively referred to throughout the remainder of this Agreement as "Releasees"), of and from any and all claims, known and unknown, asserted or unasserted, which the Employee has or may have against Releasees as of the date of execution of this Separation Agreement & Release, including, but not limited to, any alleged violation of:

     ▪   Title VII of the Civil Rights Act of 1964;

     ▪   Sections 1981 through 1988 of Title 42 of the United States Code;

     ▪   The Employee Retirement Income Security Act of 1974 ("ERISA");

     ▪   The Immigration Reform and Control Act;

     ▪   The Americans with Disabilities Act of 1990;

- The Age Discrimination in Employment Act of 1967 ("ADEA");

- The Family Medical Leave Act ("FMLA");

- The Equal Pay Act;

- The Workers Adjustment and Retraining Notification Act;

- The Fair Credit Reporting Act;

- any other federal, state or local law, rule, regulation, or ordinance;

- any public policy, contract, tort, or common law; or

- any basis for recovering costs, fees, or other expenses including attorneys' fees incurred in these matters.

If any claim is not subject to release, to the extent permitted by law, Employee waives any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Employer or any other Releasee identified in this Agreement is a party.

5. **Acknowledgments and Affirmations.** Employee affirms that Employee has not filed, caused to be filed, or presently is a party to any claim against Thor Management Company, LLC or any affiliate thereof.

Employee also affirms that Employee has been paid and/or has received all compensation, wages, bonuses, commissions, and/or vested benefits that were due Employee as of such date. Employee acknowledged that any other compensation, wages, bonuses, commissions, and/or vested benefits due at a later date shall be provided in accordance with Employer's standard procedures an applicable benefit plan documents.

Employee affirms that Employee has been granted any leave to which Employee was entitled under the Family and Medical Leave Act or related state or local leave or disability accommodation laws.

Employee further affirms that Employee has no known workplace injuries or occupational diseases.

Employee also affirms that Employee has not divulged any proprietary or confidential information of Thor Management Company, LLC or any of its affiliates and will continue to maintain the confidentiality of such information consistent with Thor Management Company LLC's policies and Employee's agreement(s) with Thor Management Company, LLC and/or common law.

Employee affirms that all of the Employer's decisions regarding Employee's pay and benefits through the date of Employee's separation of employment were not discriminatory based on age, disability, race, color, sex, religion, national origin or any other classification protected by law.

Employee further affirms that Employee has not been retaliated against for reporting any allegations of wrongdoing by Thor Management Company, LLC or its officers or affiliates (or any of their officers, directors, owners, members, shareholders or affiliates), including any allegations of corporate fraud.

Employee shall not apply in the future for employment with Thor Management Company, LLC or any affiliate thereof because of, among other things, irreconcilable differences with Thor Management Company, LLC.

Both parties acknowledge that this Agreement does not limit either party's right, where applicable, to file or participate in an investigative proceeding of any federal, state or local governmental agency. To the extent permitted by law, Employee agrees that if such an administrative claim is made, Employee shall not be entitled to recovery of individual monetary relief or other individual remedies.

6.     **Confidentiality and Return of Property**.  Employee agrees not to disclose any information regarding the underlying facts leading up to or the existence or substance of this Separation Agreement & Release, except to Employee's spouse, tax advisor, and/or an attorney with whom Employee chooses to consult regarding Employee's consideration of this Separation Agreement & Release.

In the event Employee or Employee's counsel believe either is compelled to provide or disclose information described in this paragraph, they will provide written notice of such belief, via facsimile and mail, to Marcela Claros, Benefits Administrator, 25 West 39 Street, Fl 3, New York, NY 10018, Fax # 212-596-4619, no later than seven (7) business days prior to said production or disclosure. This Agreement shall not be filed with any court and shall remain forever confidential except in an action to enforce or for breach of this Agreement. If Employee asserts an action to enforce this Agreement or for breach of this Agreement, Employee shall maintain such confidentiality by whatever means necessary, including, but not limited to, submitting the Agreement to a court under confidential seal.

Employee affirms that Employee has returned all of Thor Management Company, LLC 's property, documents, and/or any confidential information in Employee's possession or control. Employee also affirms that Employee is in possession of all of Employee's property that Employee had at Thor Management Company, LLC 's premises and that Thor Management Company, LLC is not in possession of any of Employee's property.

7.     **Cooperation.**  Subject to Employee's other personal and professional obligations and on reasonable notice and at reasonable times, Employee will cooperate with Employer and its counsel in connection with any investigation, administrative or regulatory proceeding or litigation relating to any matter in which Employee was involved or of which Employee has knowledge as a result of Employee's employment with Employer and/or any Released Party or Released Parties.

8.     **Governing Law and Interpretation.**  This Separation Agreement & Release shall be governed and conformed in accordance with the laws of the state in which Employee worked at the time of Employee's last day of employment without regard to its conflict of laws provision. In the event of a breach of any provision of this Separation Agreement & Release, either party may institute an action specifically to enforce any term or terms of this Separation Agreement & Release and/or seek any damages for breach. Should any provision of this Separation Agreement & Release be declared illegal

or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision shall immediately become null and void, leaving the remainder of this Separation Agreement & Release in full force and effect.

       9.    **Nonadmission of Wrongdoing.**  The Parties agree that neither this Separation Agreement & Release nor the furnishing of the consideration for this Separation Agreement & Release shall be deemed or construed at any time for any purpose as an admission by Releasees of wrongdoing or evidence of any liability or unlawful conduct of any kind.

       10.    **Amendment**.  This Separation Agreement & Release may not be modified, altered or changed except in writing and signed by both Parties wherein specific reference is made to this Separation Agreement & Release.

       11.    **Entire Agreement.**  This Separation Agreement & Release sets forth the entire agreement between the Parties hereto, and fully supersedes any prior agreements or understandings between the Parties, which is incorporated herein by reference. It is understood and agreed that those covenants which survive termination under employee's Employment Agreement with Thor Equities LLC dated June 11, 2021, shall continue to survive as provided for thereunder. Employee acknowledges that Employee has not relied on any representations, promises, or agreements of any kind made to Employee in connection with Employee's decision to accept this Separation Agreement & Release, except for those set forth in this Separation Agreement & Release.

       **EMPLOYEE IS ADVISED THAT EMPLOYEE HAS UP TO TWENTY-ONE (21) CALENDAR DAYS TO CONSIDER THIS SEPARATION AGREEMENT & RELEASE. EMPLOYEE ALSO IS ADVISED TO CONSULT WITH AN ATTORNEY PRIOR TO EMPLOYEE'S SIGNING OF THIS SEPARATION AGREEMENT & RELEASE.**

       **EMPLOYEE MAY REVOKE THIS SEPARATION AGREEMENT & RELEASE FOR A PERIOD OF SEVEN (7) CALENDAR DAYS FOLLOWING THE DAY EMPLOYEE SIGNS THIS SEPARATION AGREEMENT & RELEASE.  ANY REVOCATION WITHIN THIS PERIOD MUST BE SUBMITTED, IN WRITING, TO MARCELA CLAROS AND STATE, "I HEREBY REVOKE MY ACCEPTANCE OF OUR SEPARATION AGREEMENT & RELEASE."  THE REVOCATION MUST BE PERSONALLY DELIVERED TO MARCELA CLAROS OR HIS/HER DESIGNEE, OR MAILED TO MARCELA CLAROS AND POSTMARKED WITHIN SEVEN (7) CALENDAR DAYS AFTER EMPLOYEE SIGNS THIS SEPARATION AGREEMENT & RELEASE.**

       **EMPLOYEE AGREES THAT ANY MODIFICATIONS, MATERIAL OR OTHERWISE, MADE TO THIS SEPARATION AGREEMENT & RELEASE, DO NOT RESTART OR AFFECT IN ANY MANNER THE ORIGINAL UP TO TWENTY-ONE (21) CALENDAR DAY CONSIDERATION PERIOD.**

       **EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS SEPARATION AGREEMENT & RELEASE INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST RELEASEES.**

The Parties knowingly and voluntarily sign this Separation Agreement & Release as of the date(s) set forth below:

Thor Management Company, LLC

By: _____          By: _____
Laura Kaufman                                    Melissa Gliatta
                                                         Chief Operating Officer

Date:: _____          Date: _____

_____, 2022

Laura Kaufman
38 Delafield Island Road
Darien, CT 06820

Re:    Separation Agreement & Release

Dear Melissa:

On _____, [date] I signed a Separation Agreement & Release between **Thor Management Company, LLC** and me.  I was advised in writing by **Thor Management Company, LLC** to consult with an attorney of my choosing, prior to executing this Separation Agreement & Release.

More than seven (7) calendar days have elapsed since I executed the above-mentioned Separation Agreement & Release.  I have not revoked my acceptance or execution of that Separation Agreement & Release and hereby reaffirm my acceptance of that Separation Agreement & Release up through the date of this letter.

Very truly yours,

Laura Kaufman